THEODORE H. FRANK (SBN 196332)
        tedfrank@gmail.com
**CENTER FOR CLASS ACTION FAIRNESS LLC**
1718 M Street NW
No. 236
Washington, DC 20036
(703) 203-3848

*Attorney for Objectors William J. Brennan, Bill Clendineng, William E. Gerken, Benjamin T. Rittgers,*
*Henry Towsner, Scott M. Univer, and Aaron J. Walker*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Bluetooth Headset Products Liability Litigation | Case No. 2:07-ML-01822-DSF-E<br><br>**RENEWED OBJECTION TO PROPOSED SETTLEMENT**<br><br>Judge:       Hon. Dale S. Fischer<br>Date:        April 16, 2012<br>Time:        1:30 p.m.<br>Courtroom:  840<br><br>**<u>CLASS ACTION</u>** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. I

TABLE OF AUTHORITIES .......................................................................... II

INTRODUCTION ........................................................................................... 1

I.  The Settling Parties Have Failed to Meet Their Burden of Proving That the Injunctive Relief Is a Net Benefit to the Class. ................................. 2

    A.  The $874 Million Figure Is Fictional, and Does Not Meet *Daubert*. ......... 4

    B.  Fligor's Own Analysis Considers the Settlement Warnings Worthless. ................................................................... 6

    C.  Kinsella Admittedly Is Not Valuing the Warnings. ................................. 7

II.  Class Notice Expenses Are a Cost, Not a Benefit, and It Is an Error of Law to Conclude Otherwise. ......................................................... 9

III.  The Settlement Is Impermissibly Self-Dealing. .................................... 12

    A.  A District Court Must Protect Absent Class Members' Interests. .......... 13

    B.  The Multiple Indicia of Self-Dealing in This Settlement at the Expense of the Class Requires Rejection of the Settlement. .................... 14

IV.  The Class Representatives Are Not Adequate Under Rule 23(a)(4). ................. 20

CONCLUSION ............................................................................................. 22

# TABLE OF AUTHORITIES

*Birdsong v. Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009) ............................................................ 16

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................6

*Churchill Village, LLC v. General Elec.*,
    361 F.3d 566 (9th Cir. 2004) ...................................................... 1, 13

*Elizabeth M. v. Montenez*,
    458 F.3d 779 (8th Cir. 2006) ............................................................ 21

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987) ................................................................ 13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................11-12, 14-15

*Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC,
    2011 U.S. Dist. LEXIS 117927 (N.D. Cal. Oct. 12, 2011) ................. 19

*Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC,
    2012 U.S. Dist. LEXIS 13797 (N.D. Cal. Feb. 6, 2012) ...................... 19

*In re Aqua Dots Prod. Liab. Lit.*,
    654 F.3d 748 (7th Cir. 2011) ......................................................8-9, 21

*In re Bluetooth Headset Prod. Liab. Lit.*,
    654 F.3d 935 (9th Cir. 2011) ......................................................*passim*

*In re Cendant Corp. Litig.*,
    243 F.3d 722 (3d Cir. 2001) ..........................................................9-10

*In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3rd Cir. 1995) .........................................................14-15

*In re TD Ameritrade Accountholder Litigation*,
    266 F.R.D. 418, (N.D. Cal. 2009) .......................................................7

*In re Wells Fargo Securities Litigation*,
    157 F.R.D. 467 (N.D. Cal. 1994) .................................................. 9, 11

*Johnston v. Comerica*,
    83 F.3d 241 (8th Cir. 1996) .......................................................15, 19

*Kamilewicz v. Bank of Boston*,
    100 F.3d 1348 (7th Cir. 1996) ............................................................. 10

*Larkin v. Pfizer, Inc.*,
    153 S.W.3d 758 (Ky. 2004) ...................................................................3

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2002)........................................................ 17, 19

*McNair v. Synapse Group, Inc*,
    No. 11-1743, 2012 U.S. App. LEXIS 4593 (3d Cir. Mar. 6, 2012) ................ 2, 20

*Mirfasihi v. Fleet Mortgage Corp.*,
    356 F.3d 781 (7th Cir. 2004) ..........................................................13-14

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) .............................................................. 13

*Murray v. GMAC*,
    434 F.3d 948 (7th Cir. 2006) .............................................................. 20

*Nachshin v. AOL, Inc.*,
    663 F.3d 1034 (9th Cir. 2011) ............................................................ 11

*Robinson v. McNeil Consumer Healthcare*,
    615 F.3d 861 (7th Cir. 2010) ........................................................... 3, 6

*Sobel v. Hertz*, No. 3:06-CV-00545-LRH-RAM,
    2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27, 2011) ........................... 17

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003)..................................................... 11, 13-16

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) ............................................................9-10

*True v. American Honda Co.*,
    749 F. Supp. 1052 (C.D. Cal. 2010) ..................................................3-4

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002).............................................................. 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................9-11, 17

*Weinberger v. Great Northern Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991) .................................................................17-18

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000)............................................................................... 5-6


# STATUTES AND FEDERAL RULES

28 U.S.C. § 1713 .................................................................................. 10

Fed. R. Civ. Proc. 23(a) ....................................................................... 15

Fed. R. Civ. Proc. 23(a)(4) ........................................................... 17, 19-22

Fed. R. Civ. Proc. 23(e) ................................................................7, 15, 22

Fed. R. Civ. Proc. 23(g) ....................................................................... 17


# OTHER AUTHORITIES

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ...................3-4

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, *comment b* (2010) ........ 15

Craswell, Richard, "Taking Information Seriously: Misrepresentation and Nondisclosure in
    Contract Law and Elsewhere," 92 Va. L. Rev. 565, 583-85 (2006) ......................3

Final Rule, Requirements on Content and Format of Labeling for Human Prescription Drug
    and Biological Products,
    71 Fed. Reg. 3922 (Jan. 24, 2006) ............................................................3

Geistfeld, Mark, *Inadequate Product Warnings and Causation*,
    30 U. Mich. J.L. Reform 309 (1997) ........................................................3

General Motors, "Stunt Anthem,"
    http://www.youtube.com/watch?v=iuvoSw1TiJ8 ............................................7-8

Hearing Before the H. Comm. on Oversight & Gov't Reform (testimony of Randall Lutter)
    (May 14, 2008) ..................................................................................3

Latin, Howard, "'Good' Warnings, Bad Products, and Cognitive Limitations,"
    41 UCLA L. Rev. 1193 (1994) ..................................................................3

*Manual for Complex Litigation* (4th ed. 2008), § 21.71 ................................... 15

4 NEWBERG ON CLASS ACTIONS § 11:42 (4th Ed.2009) ....................................3

Paredes, Troy A., *Information Overload and its Consequences for Securities Regulation*,
    81 Wash. U. L.Q. 417 (2003) ..............................................................3

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
    108 F.R.D. 237 (1985). ...................................................................... 16

Silver, Charles, *Due Process and the Lodestar Method*,
    74 Tulane L. Rev. 1809 (2000) .......................................................... 18

Smith, Aaron, "Consumers tune out FDA warnings,"
    CNNMoney.com, Feb. 25, 2008,
    http://money.cnn.com/2008/02/22/news/companies/fdawarning_fatigue/index.htm
    ..................................................................................................3

Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability
    Design Defect Litigation Comes of Age,*
    61 Cornell L.Rev. 495 (1976) ...........................................................3

## INTRODUCTION

In their attempt to justify a $0 settlement, the settling parties argue that the only additional factor to consider beyond the *Churchill Village* factors is collusion. This is simply incorrect. This pre-certification settlement "must withstand an even higher level of scrutiny for evidence of collusion ***or other conflicts of interest***." *In re Bluetooth Headset Prod. Liab. Lit.*, 654 F.3d 935, 946 (9th Cir. 2011). *See also id.* at 948 (fairness inquiry "is designed precisely to capture instances of unfairness not apparent on the face of the negotiations"). The parties thus miss the point entirely when they submit evidence of lack of collusion, because the Brennan Objectors ("Brennan") are not arguing that the settlement should be rejected because of collusion. Brennan argues that this settlement must be rejected as a matter of law because of the ***self-dealing*** by class counsel at the expense of the class. As the Ninth Circuit recognized, the self-dealing is plain on the face of the attorney-fee-driven settlement, which contains multiple indicia of self-dealing, not least the utter disproportion between the attorneys' fees and the class relief.

As the Brennan Objectors demonstrated in their initial objection (Docket #107), which they incorporate by reference in this brief, the "injunctive relief" is entirely worthless to the class. Plaintiffs invent an imaginary value for the relief—an absurd $874 million—but that figure is based on imaginary premises, and cannot be admitted as evidence under *Daubert*. Plaintiffs and their experts have no evidence to support their assumptions about the class's usage of headsets, no evidence about the number of class members who will see the new warnings, no evidence about how the new warnings will affect class members' behavior relative to the old warnings, and no evidence about how many class members would have suffered hearing loss even if new warnings had changed their behavior. (Indeed, in his deposition, plaintiffs' lead expert took the position that class members' knowledge of the dangers of loud volume to hearing could not protect class members against the dangers posed by headsets unless they had "detailed information" about the decibel outputs of their headsets—"detailed information" he admitted that the settlement's warnings do not include. By plaintiffs' expert's own admission, the settlement warnings are worthless.) Plaintiffs have

done no analysis of the *costs* of additional warning to the class given the recognized dangers of overwarning; they thus cannot rule out the possibility that the settlement has made class members worse off. Expert witnesses cannot bootstrap conclusions on a string of *ipse dixit*. The plaintiffs' expert opinions are inadmissible for the value of the warnings, and plaintiffs have failed to meet their burden of proving that the settlement has value for the class.

At a minimum, the fee request must be reduced substantially to reflect that the only benefit to the class is $100,000 in *cy pres*. But because there is "no apparent reason" for the reversion of additional funds to the defendant beyond class counsel's attempt to protect its fee request, the settlement, as a matter of law, must be rejected.

## I.     The Settling Parties Have Failed to Meet Their Burden of Proving That the Injunctive Relief Is a Net Benefit to the Class.

The plaintiffs claim that the "primary objective of this lawsuit was obtaining injunctive relief." This is utterly false. Dkt. # 19; *Bluetooth*, 654 F.3d at 945 n. 8 (noting that complaint "seeks to recover significant monetary damages for alleged economic injury"). Not only does the complaint seek billions of dollars of damages, but it is impossible to certify a consumer class action for prospective injunctive relief of additional warnings. *McNair v. Synapse Group, Inc*, No. 11-1743, 2012 U.S. App. LEXIS 4593 (3d Cir. Mar. 6, 2012).

The Ninth Circuit correctly recognized that the settlement warnings have next to no material difference from the warnings already contained in several class members' user manuals. *Bluetooth*, 654 F.3d at 945 n. 8. Defendants' claim that there is "no record evidence" to support this finding (which is now law of the case and binding on this court) is false: Scott Walker's and Bill Clendineng's user manuals are in the record. Dkt. #107; Ex. 1; Ex. 2. Indeed, defendants' own declarations admit that there were pre-settlement warnings, and only assert that the "specific disclosures negotiated with Plaintiffs' counsel" were negotiated later. *E.g.*, Cramer Decl. ¶ 8; Garganta Decl. ¶ 12. But, as one can see with the naked eye, the "specific disclosures" are not materially different from the pre-settlement disclosures.

The only expert witness to provide record evidence who has experience designing and evaluating warnings is J.P. Purswell. Ex. 3. As Professor Purswell's analysis demonstrates,

there is no evidence that the settlement warnings are superior to the pre-settlement warnings, or even to no warnings at all. The settlement warnings have more in common with the pre-settlement warnings than with each other. *Id.* ¶ 2.

Moreover, the settling parties have committed the fatal legal error of failing to account for the hazards of overwarning, a term entirely absent from their papers and their expert reports despite the fact that it was raised in Brennan's objection and before the Ninth Circuit. When consumers are confronted with multiple warnings for the obscure or obvious, they suffer warning overload and are less able to process important warnings because of the volume of trivial warnings they are confronted with. *See* Purswell Report ¶¶ 7-8; *Robinson v. McNeil Consumer Healthcare,* 615 F.3d 861, 869-70 (7th Cir. 2010) (Posner, J.) ("information overload" can make "warnings worthless to consumers" (citing Troy A. Paredes, "Information Overload and its Consequences for Securities Regulation," 81 Wash. U. L.Q. 417, 440-43 (2003); Howard Latin, "'Good' Warnings, Bad Products, and Cognitive Limitations," 41 UCLA L. Rev. 1193, 1211-15 (1994); Richard Craswell, "Taking Information Seriously: Misrepresentation and Nondisclosure in Contract Law and Elsewhere," 92 Va. L. Rev. 565, 583-85 (2006); and Mark Geistfeld, "Inadequate Product Warnings and Causation," 30 U. Mich. J.L. Reform 309, 322 (1997))); Twerski, Weinstein, Donaher & Piehler, "The Use and Abuse of Warnings in Products Liability Design Defect Litigation Comes of Age*,*" 61 Cornell L.Rev. 495, 513 (1976); Hearing Before the H. Comm. on Oversight & Gov't Reform (testimony of Randall Lutter) (May 14, 2008) (FDA commissioner discussing problem of overwarning); Final Rule, Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3968 (Jan. 24, 2006) (discussing problem of overwarning); *cf. also Larkin v. Pfizer, Inc.,* 153 S.W.3d 758, 764 (Ky. 2004); Aaron Smith, "Consumers tune out FDA warnings," CNNMoney.com, Feb. 25, 2008.

Any evaluation of the benefits of new warnings, as a matter of law, has to include the adverse effect of lengthy warnings on consumers. *Robinson*, *supra*. It is entirely possible that the settlement's additional warnings have made consumers worse off. Purswell Report ¶¶ 7-8. The failure of the plaintiffs to measure *either* the benefits or the costs of the warnings means

that they cannot meet their burden that the new warnings have any marginal benefit to the class—they cannot even show that the warnings are not making the class worse off. "The proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th Ed.2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*"). As such, as a matter of law, given the absence of competent evidence by the settling parties to meet their burden, and the risk that the injunctive relief makes the class worse off, it would be reversible error for this Court to assume **any** benefit to the class from the injunctive relief.

### A.   The $874 Million Figure Is Fictional, and Does Not Meet *Daubert*.

Plaintiffs argue, based on the report of Brian Fligor, that the injunctive relief is worth $874 million. But as the deposition of the Fligor shows (Ex. 4), they have no legitimate basis for this:

- Fligor is an audiologist, not an expert in the design of warnings or the economic value of warnings. Fligor Dep. 7:10-12, 40:14-41:4. He has spent less than an hour designing warnings, and does not know whether his unpaid "input" in 2005 for that warning was used. *Id.* 28:1-20, 29:7-19.

- Fligor is not familiar with and has never heard of the concept or problem of overwarning. *Id.* 32:15-17, 38:6-15.

- Fligor testified only that the settlement warnings "might" increase awareness; he admitted that the settlement warnings might not. *Id.* 8:17-9:8; Purswell Report ¶ 10.

- Fligor did not analyze the pre-settlement warnings, and is not opining whether the post-settlement warnings are more effective than the pre-settlement warnings. Fligor Dep. 10:1-11:6; Purswell Report ¶ 14. He has not "critically" analyzed the post-settlement warnings in this case. Fligor Dep. 40:14-41:16.

- Fligor has not studied whether the warnings in this case will have any influence on behavior, or whether they can be understood by Bluetooth headset users. *Id.* 26:18-27:20, 44:5-45:2.

- Fligor has no basis to opine what percentage of class members use their Bluetooth headsets eight hours a day in the absence of warnings, or what percentage of class members who do use their headsets for eight hours are receiving feedback of their own voice in the course of a conversation (rather than having breaks in receiving output at maximum volume); he simply assumed that "all" Bluetooth users use their headsets "at the maximum sound output level for eight hours a day." *Id.* 14:15-15:16, 16:10-18:3, 45:22-46:17; Purswell Report ¶ 12.

- Fligor has no basis to opine what percentage of class members will suffer hearing loss as a result of use of a Bluetooth headset. Fligor Dep. 12:9-13:13.

- Fligor has no basis to assume that class members will suffer bilateral hearing loss, as he does in his expert report. *Id.* 13:14-14:14.

- Fligor has not studied the effect of warning labels on iPod usage safety, though his report is based on comparing Bluetooth headsets to iPods. *Id.* 19:2-21:21.

- Fligor does not know what percentage of Bluetooth headset users who listen to headsets at unsafe levels will read warnings. *Id.* 25:16-18.

- Fligor does not know what percentage of Bluetooth headset users who read the warnings will understand the warnings. *Id.* 25:19-26:1.

- Fligor does not know what percentage of Bluetooth headset users are using other electronic devices at unsafe levels that might adversely affect hearing. *Id.* 49:2-14.

- Fligor's calculation that the average Bluetooth headset user will have 38 years of life expectancy needing hearing aids was an assumption that was not based on any demographic evidence. *Id.* 49:15-50:19.

*See also* Purswell Report ¶¶ 9-15.

This is neither admissible nor reliable expert testimony: it is a series of litigation-driven speculative *ipse dixit* assumptions upon speculative *ipse dixit* assumptions designed to reach a pre-ordained conclusion in a field where the "expert" is not qualified as an expert. There are thus three independent reasons to exclude Fligor's testimony under *Daubert* and the Federal Rules of Evidence. *First*, expert testimony that is speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 445, 454 (2000) (*citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). *Second*, Fligor did not consider the offsetting costs of overwarning in evaluating the benefits of the injunctive relief. As such, his methodology is erroneous as a matter of law. *Robinson,* 615 F.3d at 869-70 (theory that additional warnings create benefit must account for dangers of warning overload). *Third*, Fligor is admittedly not an expert in the design or valuation of warnings. As such, his opinion on the valuation is neither admissible nor reliable as expert opinion, and it would be an error of law to give it any weight. Without the Fligor opinion, plaintiffs have no basis for their laughable valuation of hundreds of millions of dollars, or even a valuation of one dollar.

## B.    Fligor's Own Analysis Considers the Settlement Warnings Worthless.

Fligor gave the following deposition testimony to support his contention that consumers were not already aware of the dangers of Bluetooth headsets:

> Q: So it is your opinion that only a trained audiologist with experience knows whether or not it is unsafe to listen to a device at a high volume level?
>
> MR. HART: I object to the form of the question.
>
> A: It's my opinion that outside of those rare individuals who are able to educate themselves to such a high degree that no one would be able to determine whether the level at which they're listening is relatively safe or relatively unsafe.
>
> Q: So even after you've warned your patients, they might be listening to the Bluetooth device at unsafe levels?

A: No, because I would be able to provide them with detailed enough information to help them to use the device in a safe manner.

Q: What is that detailed information that is required for them to use the device in a safe manner?

A: The actual output level of the device in their ear at a given volume control setting, which is something that I can measure with my equipment and my -- in my clinic.

Q: And do the warnings provided in this settlement provide that detailed information?

A: To my knowledge, they don't. [Fligor Dep. 74:5-75:7]

*See also* Purswell Report ¶ 14.

As an audiologist, Fligor's opinion is that the settlement warnings in this case do not provide the "actual output level of the device in their ear at a given volume control setting" necessary to "determine whether the level at which they're listening is relatively safe or relatively unsafe." Plaintiffs cannot have it both ways. The reason Fligor thinks the injunctive relief is not superfluous is because he believes that only trained audiologists and "rare individuals who are able to educate themselves to such a high degree" are capable of understanding the dangers of Bluetooth headsets. If the premise is correct, then the plaintiffs' expert has admitted that the injunctive relief is worthless, because there is no evidence that the settlement warnings in this case do provide the "detailed information" to adequately inform consumers about the dangers of Bluetooth headsets so that they can "use the device in a safe manner." If the premise is incorrect, then that is a separate and independent reason to exclude Fligor's testimony. Either way, Fligor cannot support plaintiffs' claims that the injunctive relief has any value.

## C.    Kinsella Admittedly Is Not Valuing the Warnings.

Plaintiffs also argue that the warnings have value because they substitute for the expense of providing class-wide notice of the information in the warnings, and use the

testimony of Ms. Kinsella to put a price-tag on this theory. But this is erroneous as a matter of law and as a matter of common sense. And not just any law, but the law that the Ninth Circuit propounded in this very case: "[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (*quoting In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D.Cal.2009) (Walker, J.)).

Plaintiffs' argument for valuing the warnings doesn't just contradict *Bluetooth*, but contradicts common sense. This year, General Motors advertised its Chevy Sonic during the Super Bowl by parachuting a Sonic out of an airplane. *See* "Stunt Anthem," available at http://www.youtube.com/watch?v=iuvoSw1TiJ8. The minute-long commercial gave the warning "DO NOT ATTEMPT." By plaintiffs' argument, this means that General Motors provided millions of dollars of benefit to Chevy Sonic owners because they spent that much money on a commercial that warned Sonic owners not to try to parachute their vehicle out of an airplane. Obviously, the value of the warning depends not on the advertising budget necessary to expose parties to a warning, but on the relevance and content and effectiveness of the warning itself—the Kinsella Declaration is thus simply irrelevant. Plaintiffs have utterly failed to demonstrate that the injunctive relief of different warnings in Bluetooth manuals provides any marginal benefit compared to the content of the pre-settlement manuals, have utterly failed to demonstrate that the class members will see the new warnings, have utterly failed to demonstrate that class members will benefit from the new warnings, and have utterly failed to demonstrate that any such benefits will not be overwhelmed by the marginal cost of warning overload. Defendants make no effort to value the warnings at all; indeed, they continue to contend that the warnings are not legally necessary. Because the settling parties have failed to carry their burden of proof that the injunctive relief has value, or even that the injunctive relief does not impose costs on the class, it would be clearly erroneous to use the injunctive relief as a basis of settlement approval.

## II.     Class Notice Expenses Are a Cost, Not a Benefit, and It Is an Error of Law to Conclude Otherwise.

Plaintiffs also argue that a significant portion of the value of the settlement lies in the $1.2 million costs of notice. But the notion that class counsel is entitled to count the costs of notice as a benefit to the class is fundamentally mistaken and poor public policy. Awarding attorneys' fees regardless of whether settlement money is paid to the postal service or to the class members who are the attorneys' actual putative clients creates poor incentives that contradict the purposes behind this Circuit's "percentage of the recovery" fee approach. The recently decided *In re Aqua Dots Prod. Liab. Lit.* is informative: the Seventh Circuit recognized that items such as the notice and class administration expense of class action settlement and litigation are a social ***cost*** that present an argument against class certification; if class notice was a class benefit, *Aqua Dots* would have reached the opposite result. 654 F.3d 748, 751 (7th Cir. 2011) (Easterbrook, J.).

This is demonstrated by examining the way plaintiffs' proposed scheme would work in the real world. As part of its share of the settlement, class counsel in effect is demanding a cut of the notice expenses. But the money going to the settlement administrator is money going to a third party, rather than the class, and should not be considered part of the constructive common fund for purposes of calculating the fee award.

Such an arrangement would create a conflict of interest between the attorney and the class. Every dollar the settlement administrator receives is a dollar that is not available to the class in settlement. If attorney fees are paid only on what the class receives, class counsel will have appropriate incentive to ensure that settlement administration is efficient and to take steps to prevent overbilling or wasteful expenditures. But if class counsel is given a commission based on the size of administrative expenses, it would have no financial incentive to oversee the efforts of the administrator, creating a perverse system of compensation that discourages assignment of resources to the class.

These principles are not solely a matter of common-sense economics; former Chief Judge Vaughn Walker made precisely this point in a case where he was evaluating competing

1  bids for lead class counsel: "First, an attorney generally has no incentive to minimize litigation

2  expenses unless his fee award is inversely related to such expenses. Second, when an attorney

3  treats a resource devoted to litigation as a reimbursable expense, the attorney has a clear

4  incentive to substitute that resource for those paid for out of the attorney fee, even if it

5  increases the overall cost of the litigation to the client." *In re Wells Fargo Securities Litigation,*

6  157 F.R.D. 467, 470 (N.D. Cal. 1994). Conversely: "If an attorney risks losing some portion

7  of his fee award for each additional dollar in expenses he incurs, the attorney is sure to

8  minimize expenses." *Id.* at 471. This principle of the need to align attorney incentives with

9  maximizing class benefit is what lies behind several circuits' adoption of the "percentage-of-

10  the-fund" approach in calculating fee awards. *In re Cendant Corp. Litig.,* 243 F.3d 722, 732 n.12

11  (3d Cir. 2001); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265–71 (D.C. Cir. 1993). *See also*

12  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (attorney fee

13  calculations should use methods that align the interests of attorney and client).

14       Put another way, class members are not indifferent between a settlement that spends

15  $19 million in notice costs to distribute $2 million to the class and a settlement that incurs

16  $1 million in notice costs to distribute $20 million to the class. The latter settlement is worth

17  ten times as much to the class, but, by plaintiffs' argument, the two settlements should be

18  treated as identical victories. This is wrong.

19       To award class counsel a commission on notice expenses would produce absurd

20  results that contradict federal law. Imagine a hypothetical settlement under the Class Action

21  Fairness Act. The imaginary class action *Potter v. Bailey Building & Loan* settles: the defendant

22  bank will spend $20 million in notice expenses to precisely redistribute $1 million to the class

23  of Bailey accountholders. Class counsel for Potter, using plaintiffs' argument here, claim that

24  they have produced a $21 million settlement and are entitled to $7 million in fees, to be

25  deducted from the class members' bank accounts. Such a settlement—where class members

26  pay $7 million to attorneys but receive $1 million in cash—would contradict the intent of 28

27  U.S.C. § 1713, which prohibits settlements where class members lose money. *Cf. Kamilewicz v.*

28  *Bank of Boston,* 100 F.3d 1348 (7th Cir. 1996) (Easterbrook, J., dissenting from denial of

1  rehearing *en banc*) (discussing similarly abusive settlement). But if this Court adopts plaintiffs'
2  argument that administrative expenses are a class benefit, the hypothetical Bailey Building &
3  Loan settlement would pass § 1713 muster at the expense of the class members whom § 1713
4  is meant to protect. This is wrong.

5        Obviously, notice costs are categories of expense that must be borne. But there is no
6  reason to give class counsel a commission on these expenses. The practice bears an
7  uncomfortable resemblance to awarding a military contractor a cost-plus contract: as a
8  general matter, such arrangements require additional oversight—in this case, judicial
9  administration—to ensure that appropriate cost controls have been established, because
10  some of the typical contract incentives for efficiency are absent. Indeed, a commission on
11  administration actually gives an incentive to class counsel to increase these categories of
12  expenditure. For the same reason that it is inefficient to have judges engage in "gimlet-eyed
13  review" to audit of lodestar calculations, it is inefficient to have judges closely scrutinize
14  settlement administrative expenses when it is much simpler to merely align class counsel's
15  incentives to optimize those expenses. *Cf. Wal-Mart Stores*, 396 F.3d at 121.

16        It is thus preferable for this court to approve a superior system of attorney
17  compensation, rather than asking district courts to shrink waste by means of judicial
18  monitoring of cost overruns in the future. "Put another way, incentives to minimize expenses
19  and to allocate resources properly go much farther toward cost efficiency than can *post hoc*
20  judicial review." *In re Wells Fargo Securities Litigation,* 157 F.R.D. at 471.

21        The Ninth Circuit did leave open the question of whether notice expenses could ever
22  be considered a class benefit. *Bluetooth*, 654 F.3d at 945 (including notice expenses as a
23  hypothetical). For the reasons stated above, they should never be considered a class benefit.
24  Plaintiffs' argument should be rejected. The only class benefits in this settlement is the token
25  $100,000 payment to charities—and even that *cy pres* is questionable, given there is no
26  competent evidence that class members will suffer unusual hearing impairments. *Nachshin v.*
27  *AOL, Inc.*, 663 F.3d 1034 (9th Cir. 2011) (*cy pres* must be targeted to be "next best" benefit to
28  class).

### III.   The Settlement Is Impermissibly Self-Dealing.

The parties argue at length that they did not actually collude. This is an entirely irrelevant red herring. Lack of collusion is *necessary* to approve a settlement, but it is not *sufficient*. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Bluetooth*, 654 F.3d at 947 (*citing Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)). The Ninth Circuit warned that a pre-certification settlement such as this one "must withstand an even higher level of scrutiny for evidence of collusion **or other conflicts of interest**." *Bluetooth*, 654 F.3d at 946 (emphasis added). Brennan's objection rests on an entirely different sort of conflict of interest than collusion: that of impermissible self-dealing by the class counsel "when counsel receive a disproportionate distribution of the settlement." *Id.* at 947 (9th Cir. 2011) (*quoting Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1021 (9th Cir. 1998)). The fact that class counsel negotiated the settlement under the eyes of a mediator does not change the risk of self-dealing: a mediator is trying to get parties to agree to a settlement, not protect the interests of absent class members. *Cf. Bluetooth*, 654 F.3d at 948 (presence of mediator not dispositive on question of fairness). If anything, recognizing the interests of absent class members interferes with the mediator's goal of settling the case, as every dollar going to an absent class member is a dollar not going to class counsel who must agree to go forward with the settlement.

Brennan is not arguing that the parties colluded to eliminate legitimate class claims. Nor is Brennan claiming that the defendants were required to settle the case for $10 million or $2 million or some number larger than the neighborhood of $1 million. He does dispute, however, that class counsel can arrange such a settlement where class counsel collects the vast majority of the class benefits, a share of the class benefits well in excess of the Ninth Circuit's 25% benchmark, with no hope of the class recapturing the overage of the unreasonable fee request. Such a settlement is unfair, but it does not require collusion, just a defendant's indifference to class counsel's conflict of interest. The settling parties entirely fail to address this: indeed, defendants' brief and declarations affirmatively demonstrate their

indifference to the class counsel's conflict of interest—indeed, the defendants claim that they *preferred* an unfair settlement that would give a disproportionate share of the benefits to the class counsel.[1]

When class counsel negotiates more monetary benefits for itself than for the class in a consumer class action over quantifiable pecuniary claims (as opposed to, for instance, class actions over civil rights), it must structure the settlement to permit the district court to potentially cure the self-dealing. Instead, class counsel negotiated a "kicker" clause in a successful attempt to shield their fee request: the fees would come from a separate pot of money, and any reversion would go to the defendant, rather than the class. This adversely affected the class's interests without any offsetting benefit: Defendants were willing to put up $0.9 million in cash to settle the litigation, agreeing not to challenge the fee request by the attorneys. For "no apparent reason" other than self-dealing, class counsel ensured that most of that money could not go to their own clients or to the *cy pres* recipients.

The settlement is *per se* unfair as a matter of law because of the disproportion between the fees collected and the amount paid to the class. It would be reversible error to approve it.

## A.    A District Court Must Protect Absent Class Members' Interests.

This Circuit's precedents call upon courts to consider an eight-factor test to evaluate the fairness of a settlement: "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental

---

[1] This claim is implausible, given that the consequences to the defendant of permitting class counsel to profit from a supposedly meritless lawsuit are more expensive than the consequences of giving a slightly larger charitable donation. Each of the defendants already has a charitable program, and the *cy pres* award simply reflects a costless shifting of a small percentage of existing commitments to charity. But even if defendants do sincerely believe that they prefer spending money on class counsel instead of *cy pres*, those preferences are irrelevant to the objective fairness of the settlement under the law, which does not permit such a disproportionate share of total benefits going to class counsel.

1  participant; and the reaction of the class members to the proposed settlement." *Churchill*

2  *Village, LLC v. General Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). However, the Ninth Circuit

3  has never held that the *Churchill Village* factors are the exclusive means of evaluating a

4  settlement. *See, e.g., Bluetooth*, 654 F.3d at 946-47; *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003)

5  (reversing settlement approval for unfairness for reasons outside of *Churchill Village* test).

6  Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle

7  signs that class counsel have allowed pursuit of their own self-interests … to infect the

8  negotiations." *Bluetooth* at 947 (*citing Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)).

9  Other circuits agree. A "district court ha[s] a fiduciary responsibility to the silent class

10  members." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). It is not enough that

11  the settlement happened to be at "arm's length" without explicit collusion; the settlement

12  must be objectively reasonable as well and avoid self-dealing by the class counsel. "Because

13  class actions are rife with potential conflicts of interest between class counsel and class

14  members, district judges presiding over such actions are expected to give careful scrutiny to

15  the terms of proposed settlements in order to make sure that class counsel are behaving as

16  honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785

17  (7th Cir. 2004) (Posner, J.).

18  **B.   The Multiple Indicia of Self-Dealing in This Settlement at the Expense of**

19  **the Class Requires Rejection of the Settlement.**

20  The concerns about the potential conflict of interest between class counsel and their

21  clients "warrant special attention when the record suggests that settlement is driven by fees;

22  that is, when counsel receive a disproportionate distribution of the settlement…" *Hanlon v.*

23  *Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *accord Bluetooth*, 654 F.3d at 947. "If fees

24  are unreasonably high, the likelihood is that the defendant obtained an economically

25  beneficial concession with regard to the merits provisions, in the form of lower monetary

26  payments to class members or less injunctive relief for the class than could otherwise have

27  obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003); *accord Bluetooth*, 654 F.3d at

28  947.

1    There need not be explicit collusion to create the sort of self-dealing unfairness that

2    benefits class counsel at the expense of their clients, only acquiescence: "a defendant is

3    interested only in disposing of the total claim asserted against it" and "the allocation between

4    the class payment and the attorneys' fees is of little or no interest to the defense." *Staton*, 327

5    F.3d at 964 (*quoting In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d

6    768, 819-20 (3d Cir. 1995)); *accord Bluetooth*, 654 F.3d at 949; *Mirfasihi*, 356 F.3d at 785. The

7    declarations and the brief submitted by defendants demonstrate precisely the problem of

8    indifference that the Ninth Circuit has repeatedly identified. Because of this, it is erroneous to

9    conclude that once the prospect of express collusion is eliminated because of the presence of

10   a mediator, the inquiry is therefore at an end: class counsel can achieve an impermissible self-

11   dealing settlement simply through a defendant's and a mediator's indifference to the

12   allocation. *Staton*, 327 F.3d at 964. (One will note that the mediator's declaration says nothing

13   about any attempt to ensure that the class was fairly treated by the settlement. We can

14   therefore draw the appropriate adverse inference that the mediator, who owed no duty to the

15   class, did not gratuitously assume one.) Thus, courts judging the fairness of a settlement

16   should not just simply ask whether a settlement was negotiated at arms' length, but whether

17   the attorneys are unfairly attuned to their self-interest at the expense of the class. *Bluetooth*,

18   654 F.3d at 947; *id.* at 948 ("While the Rule 23(a) adequacy of representation inquiry is

19   designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,'

20   the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness

21   not apparent on the face of the negotiations." (*quoting Staton,* 327 F.3d at 960)); *cf. also ALI*

22   *Principles* § 3.05, *comment b* at 208 ("a proposed settlement in which the class receives an

23   insubstantial payment while the fees requested by counsel are substantial could raise fairness

24   concerns").

25   *Bluetooth* suggests a nonexclusive list of three possible signs of self-dealing. *Bluetooth,*

26   654 F.3d at 947. As the Ninth Circuit found, all three of these "multiple indicia" of unfairness

27   are present here. *Id.* The mediator did nothing to stop this self-dealing; as *Bluetooth* noted, the

28   mediator's approval of the settlement does not fulfill the Rule 23(e) requirements. *Id.* at 948.

*First*, "counsel receive[d] a disproportionate distribution of the settlement." *Id.* at 947 (*quoting Hanlon*, 150 F.3d at 1021). Class counsel and the representatives are asking for $862,000 for themselves, when the only conceivable benefit to the class is the $100,000 *cy pres*, less than an eighth of class counsel's receipts. As a practical matter, by asking for 862% of what their clients received, class counsel and representatives have obtained over 89% of the constructive common fund for itself, several times the Ninth Circuit's 25% benchmark. *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 (3rd Cir. 1995) (severable fee structure "is, for practical purposes, a constructive common fund"); *id.* at 821 ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnston v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."). "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* § 21.71 (4th ed. 2008).

As the Declaration of David R. Henderson (Ex. 5) shows, the fact that fees may not be negotiated until after the rest of the settlement makes no economic difference. The settling parties are rational economic actors. Even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount the defendants are willing to pay class counsel. The defendants can further reasonably estimate in advance what plaintiffs will claim their lodestar to be from their own defense costs. Because these future fee negotiations are not an unexpected surprise, and because the parties know a settlement will not occur unless the parties agree to an attorney-fee clause, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. "Even if the plaintiff's attorney does not

consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 266 (1985); *cf. also Bluetooth*, 654 F.3d at 948 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair). "In other words, the negotiation of class counsel's attorneys' fees is not exempt from the truism that there is no such thing as a free lunch." *Staton*, 327 F.3d at 964.

Defendants argue that the disproportion between the fees and the class relief is "because Plaintiffs' case lacked merit." Dkt. #348 at 4; *cf. also Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009) (upholding motion to dismiss identical case against Apple over iPods). This is a *non sequitur*. The lack of merit of plaintiffs' case explains why the total constructive common fund is under a million dollars. It does not explain why the parties agreed to a settlement that paid over 89% of that figure to the attorneys and the class representatives, under 11% of that figure to third-party *cy pres* recipients, and nothing to the class. Indeed, defendants' argument, if adopted by this Court, would create extraordinarily perverse incentives: class counsel can collect a greater percentage in a case when they bring a low-merit case than by winning a meritorious case. As such, it has to be considered incorrect as a matter of law. If anything, that the defendants have made this argument is *per se* evidence of the indifference that has caused this settlement to be so unfair in the first place: because neither the defendants nor the class counsel had any interest in protecting the interests of the class, the class received nothing. Of course, defendants owe nothing to the class—but Rules 23(a)(4) and 23(g) require the class representatives and the class counsel to put the class's interests first. *Bluetooth*, 654 F.3d at 949; *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).

For this reason, the lodestar cannot justify the fee request. As in *Sobel v. Hertz*, No. 3:06-CV-00545-LRH-RAM, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011), "Class Counsel has requested for itself an uncontested cash award… based on a lodestar, rather than on the value of the class recovery, with only a modest discount from the claimed

1  lodestar amount. In other words, the class is being asked to 'settle,' yet Class Counsel has

2  applied for fees as if it had won the case outright." This case is far worse than the rejected

3  settlement in *Sobel*, where the class was at least entitled to coupons of some marginal value. In

4  this case, the class gets nothing, but Class Counsel is asking for a percentage of the lodestar

5  that still allows Class Counsel to profit handsomely. Even if the multiplier goes as low as

6  50%, Class Counsel will be compensated for their associates at $225/hour—when it is quite

7  certain that Class Counsel is not paying their associates anywhere near $450,000 a year. Class

8  Counsel brought a complaint seeking billions of dollars. Having achieved less than 0.01% of

9  their original goals, any award based on lodestar is highly inappropriate: it creates perverse

10  incentives if attorneys' fees bear no relationship to the success the class achieves. *Wal-Mart

11  Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (attorney fee calculations

12  should use methods that align the interests of attorney and client).

13      *Second*, the settlement has a "clear sailing" arrangement providing for the payment of

14  attorneys' fees separate and apart from class funds without challenge from the defendants.

15  *Bluetooth*, 654 F.3d at 948. A clear sailing clause stipulates that attorney awards will not be

16  contested by opposing parties. "Such a clause by its very nature deprives the court of the

17  advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518,

18  525 (1st Cir. 1991). The clear sailing clause lays the groundwork for lawyers to "urge a class

19  settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment

20  on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 947. Here, class counsel put its own fees

21  ahead of the interests of the class by negotiating a provision that insulated those fees from

22  challenge by the defendant. The defendants characterize this as simply capping the attorneys'

23  fees request. Dkt. #348 at 5. This is disingenuous: the plaintiffs yielded the valuable

24  concession that the defendants would not challenge the fees. Instead of the class receiving

25  benefits, we are treated to the absurdity of the defendants paying high-priced lawyers to argue

26  in favor of their clients paying an oversized fee award for the class counsel, something that

27  would not have happened in the absence of a clear sailing clause negotiated at the class's

28  expense.

*Third*, the "parties arrange[d] for fees not awarded to revert to defendants rather than be added to the class fund." *Bluetooth,* 654 F.3d at 947. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id.* at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.*

The class is unambiguously worse off when any reduction in a fee award reverts to the defendant instead of the class. The only reason to negotiate that provision is for the self-serving effect of protecting class counsel by deterring scrutiny of the fee award. *First*, a court has less incentive to scrutinize a fee award, because the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that had already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 Tulane L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"). *Second*, the kicker deters scrutiny of class counsel in another way: under current Ninth Circuit law, objectors are not entitled to fees unless they provide a substantial benefit to the class. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). But because a reduction of fees in a kicker settlement revert to the defendant, a good-faith for-profit objector has no financial incentive to object to the fee arrangement.

Plaintiffs cite (Dkt. #347 at 14) to *Harris v. Vector Mktg. Corp.* for the proposition that a kicker is permissible, but that case actually supports rejecting the settlement: *Harris* held that the settlement in that case was "not as extreme a situation as that in *Bluetooth*," but refused settlement approval anyway. *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 U.S. Dist. LEXIS 117927, at *17 (N.D. Cal. Oct. 12, 2011). Only after the parties modified the settlement to remove the disproportion in the case was *Harris* willing to approve the settlement. 2012 U.S. Dist. LEXIS 13797 (N.D. Cal. Feb. 6, 2012). Plaintiffs' other cites to

1   approvals of kicker settlements all predate *Bluetooth*, and cannot be considered good law when

2   those courts failed to give the scrutiny that *Bluetooth* requires.[2]

3   **IV.   The Class Representatives Are Not Adequate Under Rule 23(a)(4).**

4        There are three independent reasons why this Court should decertify the class and find

5   that Rule 23(a)(4) is not met.

6        *First,* potential overpayment of fees in a settlement doesn't just affect the defendant,

7   but affects the class, especially when the attorneys are receiving a "disproportionate fee" that

8   may "betray the class's interests." *Bluetooth*, 654 F.3d at 949. "Even when technically funded

9   separately, the class recovery and the agreement on attorneys' fees should be viewed as a

10   'package deal.'" *Bluetooth*, 654 F.3d at 948-49 (*quoting Johnston*, 83 F.3d at 245-46). But if "class

11   counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then

12   class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal.,*

13   *Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000). If class representatives permitted this breach to

14   happen simply by virtue of receiving an "untenable" $12,000 in representative payments

15   (*Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006)), they do not meet the Rule 23(a)(4)

16   standard, and the class should be decertified. The "class device" should not "be[] used to

17   obtain leverage for one person's benefit." *Id.* As Brennan noted in his original objection, this

18   settlement is many times worse than the one that *Murray* considered an abuse of discretion:

19   "There was one class representative in *Murray* who received $3,000, three times maximum

20   possible statutory damages; here, there are nine class representatives seeking a total of

21   $12,000 over the purchase of a few hundred dollars of headsets without any indication of

22   personal [or economic] injury. In *Murray,* the 1.2 million unnamed class members were

---

[2] Plaintiffs assert that avoiding a kicker was impossible because there were nearly 5 million class members. Pl. Br. 15. This is false. If the *cy pres* is to be considered a benefit to the class, it was possible for excess fees to revert to the *cy pres* recipients instead of the defendants. Moreover, it was possible to structure the settlement as a *pro rata* claims-made settlement. Given a typical claims rate of 1%, class members who made claims on a $962,000 common fund could have received over $10 each.

1   entitled to split a fund of $947,000; here, [4.9 million] class members will end up with zero.

2   And to top it all off, the Putative Class Attorneys are seeking attorneys' fees twice as high as

3   those in *Murray*." Dkt. #107 at 3.

4      Here, the fee request is plainly excessive, nearly thirty times what Class Counsel could

5   legitimately obtain if they adhered to the 25% benchmark given that class recovery is capped

6   at a $100,000 *cy pres* contribution. But when "the defendant is willing to pay a certain sum in

7   attorneys' fees as part of the settlement package, but the full fee award would be

8   unreasonable, there is ***no apparent reason*** the class should not benefit from the excess

9   allotted for fees." *Bluetooth*, 654 F.3d at 949 (emphasis added). The parties provide no

10  legitimate reason for the kicker here. The reversion of an oversized fee request to the

11  defendant is *per se* self-dealing that makes the settlement inherently unfair under Rule 23(e).

12     *Second*, the class representatives entirely abandoned any consumer fraud claims, seeking

13  only prospective injunctive relief in the hopes of winning themselves and their class counsel a

14  disproportionate share of the settlement proceeds. But the class representatives do not have

15  standing to seek prospective injunctive relief, and cannot represent the class. *McNair v.*

16  *Synapse Group, Inc*, No. 11-1743, 2012 U.S. App. LEXIS 4593 (3d Cir. Mar. 6, 2012); *Elizabeth*

17  *M. v. Montenez*, 458 F.3d 779, 784-85 (8th Cir. 2006).

18     *Third*, as evident both from the settlement and the declarations from the defendants,

19  this was a meritless strike suit brought solely to extort attorneys' fees from the defendants at

20  the expense of the class. In the first go-around of this case, this Court suggested that this

21  "argument is better addressed to the legislature." Dkt. #299. But, as the Seventh Circuit

22  recently decided, it is not true that this Court is powerless to take action in response. *In re*

23  *Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) (Easterbrook, J.). As *Aqua Dots*

24  holds, when class representatives permit class counsel to bring class litigation to benefit

25  themselves, but has no chance of benefiting their putative class clients, they cannot meet the

26  adequacy requirements of Rule 23(a)(4), and the class should not be certified. This is exactly

27  the sort of class action condemned by *Aqua Dots*: the only potential beneficiary of this suit

28

1  was the class counsel, and neither equity nor Rule 23(a)(4) permit the abuse of the class
2  action process.

3                                    **CONCLUSION**

4          This settlement has garnered national attention as a poster child of class action abuse.
5  It would be clearly erroneous to honor plaintiffs' self-serving estimates of the settlement
6  value when those estimates fail to meet *Daubert* standards, contradict the evidence, and fail to
7  account for known costs to the class. If the Rule 23(e) inquiry is to mean anything, this
8  settlement should be rejected. The Court should further hold that the class representatives
9  cannot meet Rule 23(a)(4) when they have signed off on such an abusive and self-serving
10 settlement.

11 Dated: March 21, 2012                    Respectfully submitted,

12
13
14
15                              Theodore H. Frank (SBN 196332)
                               **CENTER FOR CLASS ACTION FAIRNESS LLC**
16                             1718 M Street NW, No. 236
                               Washington, DC 20036
17                             tedfrank@gmail.com
                               (703) 203-3848
18
19                             Attorney for Objectors
20
21
22
23
24
25
26
27
28